Good morning, your honors. I want to make sure everybody can hear me before I start. Yes. Okay. Yes, I can. Okay. Good morning, your honors. May it please the court, Brianna Mearchant on behalf of Robert Ornelas. I intend to reserve about five minutes of my time for rebuttal, and I will watch my own clock. This case obviously presents more issues than I can discuss in the time we have this morning, but unless the court guides me otherwise, I plan to start with the Franks issue and then touch briefly on the discovery violation and sufficiency of count one as time permits. So unless the court directs me otherwise, I'll dive into the Franks question, and I particularly want to focus my comments today on one misrepresentation in the warrant, and that is the agent's statement that Ross Ornelas told her that his brother had had an accusation of child molestation in 1995. Now, we don't question that that was an accurate representation of what Ross Ornelas told the agents. However, we do know that at the time that the affidavit swore the affidavit, she knew more about that allegation than that one line would reflect. In 2013, federal agents investigating this case had interviewed the complaining witness herself. The complaining witness not only provided an account of the incident, but she also indicated that it had been referred to Child Protective Services, meaning it wasn't simply a family rumor that had never reached outside ears. We know the agent at least knew that. We also know that the San Luis Obispo investigation had been cross-reported to the Orange County Sheriff's Department and the Orange County Child Protective Services. That's reflected on ER 1076. That report indicated, or those reports I should say indicate, that at least some of the complaining witness's allegations had been deemed unsubstantiated and that her allegations had changed over time. Now, not only was that report in the hands of the Orange County Sheriff's Office, but we also know that the Orange County Sheriff was one of the partner law enforcement agencies involved in this Orange County Task Force. Now, it's given that we know that there was this interview with the complaining witness, we know that there's at least some facts that aren't reflected in the warrant. We also believe that there's at least a substantial showing that the agent had the information that was in the hands of the Orange County Sheriff. And so, given that, we think that there's at least enough to get back for a Frank's hearing. As this court's decision in Standard makes clear, a defendant does not have to be sitting on the smoking gun itself to get a Frank's hearing. Only a substantial showing of a misrepresentation is required. And we believe that standard is met here. Now, it's also clear that this misrepresentation was material. Here, the affidavit contained a long profile about how child sex offenders behaved, and that profile was the basis for the broad search authority that was sought in the warrant,  that was more than a year old, at its newest. Under Weber, the court made clear that such profiles... I'm sorry, I don't want to cut you off. Were you asking? No, I'm just, what do we make of the fact that you don't challenge the portions of the affidavit that discuss Huerta's statement, and isn't that sufficient on its own to establish that any error here didn't involve materiality? So, Huerta's statement was that he saw images of child pornography, but the profile that the affiant laid out was not a profile of a consumer of child pornography, but an active hands-on offender. And I take that from ER 21035, which said, these people who maintain chat logs and videos of minors, they are or have been involved in. And again, the warrant sought permission, or sought to establish probable cause not for simply possession of child pornography, but for production of child pornography. Again, not merely a passive consumer of child pornography. Given that, the allegations related to this molestation allegation are... It would establish materiality to show that the warrant would have permitted access to the computer properly to search for possession purposes, but not for trafficking purposes? I don't understand that. So, my point is that the profile that the agent set out, right? Under Weber, these kind of profiles are permissible, but there have to be facts establishing that the defendant fits that profile. And here, the profile was not of a consumer of child pornography, but of an active hands-on offender. And the only allegation that went to him being an active hands-on offender was this allegation regarding the molestation of the niece. And that's why that allegation takes on importance in this case. I don't know if I addressed it, or perhaps as best as I can. Now, had the magistrate known that this allegation was older than Ross said it was, than Ross and Alice had indicated, that it had changed over time, and that it had been investigated at the time and deemed not substantiated, we believe that would have been material, or at least that there's a substantial showing enough to get it back for a prior hearing. And that point is also important to underline. We're not saying that the court should be ordered to dismiss the charges. We're saying that there should be a hearing where the affiant is required to explain what exactly she knew, what information she had of her possession at the time. Unless the court has questions on that, I was going to move to the discovery violation. As the court is aware, shortly before trial, the government disclosed that Special Agent Perez had committed suicide. There was some document in the possession of the government. The government thought it was at least a close enough call that they wanted the district court to rule on whether it should be turned over. Now, I meet one in this virtual room that has the lead information about what's in that document. But from the court's comments, it does appear that it was entirely unrelated to his work. And I take that from the court's comment that it was, if anything, inculpatory. The court's in-court comments also reflect considerations of everything but the low bar for materiality, whether it was exculpatory or not, whether it was admissible or not, whether it would be a privacy violation to turn it over. The only bar for disclosure is whether it was material, which is whether a low bar that requires only information that would be helpful to defend. We believe that that standard is... We don't look at it from the perspective ex ante. We look from the perspective of, does this rise to the level of something that would require a do-over? And given the, really, looking at his role in the case, his role does not appear to be terribly significant. It's mostly chain of custody, which was then independently established. So it's hard to see that it makes a difference enough, no matter what's in there, to require a new trial. What is your response to that? So, two points on that, Your Honor. One is that, of course, one of the lines of defense in this case was to challenge the carefulness with which the investigation was undertaken. And given that Agent Perez touched every piece of evidence that was taken out of the house, or virtually every piece of evidence, any information that would go to attack the care with which that investigation was undertaken, or the purity of that investigation, was material. Now, the second point I will make is that we have argued that this court should not decide harmlessness in the first instance, that it should remand it to the district court to do so. That's the procedure that's hinted at at Stever, and we do think it's the proper one to be followed here. If the error is that the information should have been disclosed, then this is not a typical harmlessness analysis. This is not simply the court saying, here is the existing trial, and here is what that evidence would have been. The test under Stever is, what could the defense have done with that information? Would they have pursued a different defense? Would they have additional investigatory leads that they would have pursued? Given that, and that there's no record on that, because the defense obviously didn't have the information, we believe the proper course would be to remand for consideration of harmlessness after the defense has been able to see what the evidence is and make a record on how they would have used it or what investigation they would have pursued based on the evidence. Can you expand on your theory on what Special Agent Perez could have done? You talk a little bit more abstract by saying that it potentially affected the purity of it, but given that his role is, again, just cataloging evidence, you're saying that he may have planted evidence? I'm trying to speak beyond the abstract, what you're suggesting. Again, it's hard for me to say because I don't know what the evidence is. What I would hypothesize is that the person who was in charge of cataloging what room every piece of evidence was found in and what exactly state it was in at the time could have perhaps put evidence in Mr. Ornelas' room instead of in the common room or something along those lines. I don't want to narrow my argument by hypothesizing because I don't know what the evidence was, but any evidence that goes to either anything about mental health or something that would allow us to attack the care with which the investigation was undertaken or anything that goes to perhaps a motive to improve the evidence against Mr. Ornelas, either one of those would have been material and either one of those would have gone to the existing defense, let alone what else Mr. Ornelas could have argued. I'm hitting the point at which I intended to reserve. I hope there's another point that the court would like me to argue before I do that. I just had a question on the instructional issue. Is it your position on the instructional issue that the instructions did not capture the underlying elements of the offense to which aiding and abetting would then be attached so it sort of flipped it from one section to the other or are you making a narrow argument? Here's what I think the strongest argument is. As the aiding and abetting instruction went, the third element said that he had to intend to facilitate the production of child pornography. But in fact the element is that the offense is production and transportation. And because the defense attacked both the production and the transportation aspect, we argue that the third element should have captured that, that the intent ran, as is required under Rosamond, to both the production and the transportation. But the aiding and abetting seems to presume that you're aiding and abetting the same person who does the production and the transportation. And here it seems that the facts, as they tried to fit them into the aiding and abetting theory, separate those two. So that one person does the production and one does the transportation. I think that the closing argument that the defense had cast doubt on all aspects of this. Was Mr. Ornelas aware that the conduct he was doing was being videotaped? And did he transport it himself? Or, as we know, that there were certainly files that were emailed from the Philippines to him. So we attacked both aspects of that. If the court is inclined, I'd like to reserve my three minutes. Thank you. All right. We'll hear now from Ms. Gannon. Good morning. May it please the court. Anne Gannon on behalf of the United States. I'd like to first address the Franks issue as well. And primarily something that the appellate counsel just mentioned, which was that the only evidence that the defendant was engaged in the molestation or production of child pornography was Ross's statement about MP. That is not correct and does not accurately state the record. In fact, Daniel Huerta told the agents that he believed that some of the images were taken in the Philippines. He told the agents that at the time that he looked into the computer, the defendant was in the Philippines, and the agents independently corroborated that by looking at government records showing that he, in fact, had traveled to the Philippines. But setting that aside, I believe Your Honor is absolutely correct that Daniel Huerta's information to the agents, which was not contested, was sufficient to establish probable cause and, as I just stated, was sufficient to support the agent's information in the affidavit based on her training experience that people who have child pornography and potentially produce and abuse children have certain characteristics. So based on what we know from Daniel Huerta, it was just 13 months prior to the affidavit that he saw images that he described with particularity. Those images were of children between the ages of two and seven. In addition, Daniel Huerta saw these chats that he described as explicit and gross and that described having a minor, the defendant chatting with a minor about having sex with a minor and the minor's mother. So this goes substantially beyond a standard child pornography case. Here we have specific evidence that the defendant was engaging in conduct beyond just possessing child pornography. What the defense tried to do in this case is go around the edges of that probable cause that was uncontested and challenge various things that Ross said. However, as the government noted in its brief, Ross on several occasions in the declaration said that he didn't recall, not that he didn't say those things. And the focus really should be here on what the affiant knew. And with regard to the allegation of MP, the record is not clear as to what the affiant knew about any subsequent investigation or the prior reporting of MP at the time that she swore out the affidavit. So here the standard is that the allegations must be of deliberate falsehood or reckless disregard for the truth. As this court has noted, negligence or innocent mistake is insufficient. There's no evidence that the affiant knew about those prior reportings, the dates of those reportings. She was just conveying to the issuing judge what she had been told, which was that this MP had told Ross about this incident and that she had felt uncomfortable with him as a result. There was nothing wrong with that and nothing improper. I'd like next to address the discovery issue. As the government noted in its brief, here the defense asked for information relating to Agent Perez's suicide that was related to Brady. They did not make a specific Rule 16 request at that time. And so the government contends that the court's in-camera decision not to disclose that evidence to the defense cannot be reviewed by this court because the defendant has not satisfied the requirements of Rule 12 because that Rule 16 motion was not made prior to trial. They're now trying to add that claim to the initial request. In addition, the defense has not satisfied the Rule 12C3's good cause standard for failure to make or even attempted to make that showing based on the fact that they did not make the Rule 16 motion pre-trial. Even if the court were to look at this discovery issue under Rule 16, the government respectfully disagrees with the defense that there's been any showing of materiality. The two points that they made in their brief was that if the agent loathes sex offenders, he might have planted evidence, and if he had a mental disturbance, it would have allowed them to attack the government's investigation. As Judge Lee pointed out, this agent had a ministerial function of bagging evidence and writing labels. The record reflects that the defense was extremely aggressive and the court permitted them to attack chain of custody and authentication with regard to each piece of evidence. In fact, the district court did not allow the government to use the evidence bag labels for that purpose. It required live testimony such that the defense would have an opportunity to question each of those witnesses about their recollection, finding the evidence, and how it was handled. During the course of the trial, there were numerous witnesses because there were so many different pieces of evidence obtained from the house. So those finding witnesses were the first link in the chain. Agent Perez was the second link in the chain as to each of those pieces of evidence in that he bagged them, he wrote on the labels, and was involved in the transportation. What the government then did was have witnesses in the third and fourth links of those chains who were able to say that they remembered the evidence either because of unique characteristics. Investigator Walsvik testified about why this particular evidence was memorable, things that can potentially be misplaced such as an unmarked compact disc. That was not the case here. The compact discs that were admitted for count seven, possession of child pornography, were unique. They were labeled in the same manner. They had the same writing. So there was a very clear manner in which to authenticate them, which is what the government did. So there's no materiality here as to a lost opportunity to attack the government investigation. In addition, the jury heard from two witnesses depicted in the images who described defendant's conduct, and there was no basis for this defense theory that Agent Perez somehow planted the evidence or was at the center of a flawed investigation. I'd next like to address the instructional issue that Judge Collins asked about, and here there are actually a variety of ways in which the jury could have found an aiding and abetting because of the aunt, and there was testimony that she was present during the abuse and that she chatted with the defendant. Here it is possible that the aunt was involved in the production of the child pornography and transported it, or the jury could have found that the defendant himself produced the child pornography and transported it. Either one of those theories was... Is it clear, though, that the same person had to do the production and the transport under a 2B charge? I mean, essentially it looks like you mischarged this. It should have been charged as A. You realized in the middle of the case you charged the wrong subsection and you tried to flip it from a B to an A by aiding and abetting, but it doesn't work if the case would support a theory that the production and transportation were done by different people. That goes in A, not in B. That's the problem I have here. Your Honor, it certainly could have been charged and instructed as causing an act to be done. Just because that is one option, it doesn't necessarily mean that an aiding and abetting instruction was incorrect in that, as I mentioned, the evidence here could have supported either of those theories. Did they tell the jury they had to find that the same person did the production and the transport? Not expressly, Your Honor. It said that someone committed that crime. The statute says, you know, it first describes any person and it describes the production and then says in B, the circumstance referred to in paragraph 1 is that the person transports. So it obviously means the same person who did the production that's referred to in paragraph 1. If that wasn't in the instruction and the evidence would have supported viewing that as being split, then I don't understand how the B charge can be sustained. What am I overlooking? The aiding and abetting instruction does say that a person committed the crime. And it references back to that earlier instruction. So I think that there is an inference that the same person was committing the entire act of the production of child pornography and that this person aided and abetted. You think that the instructions were clear enough that they excluded the possibility that the jury convicted based on him doing the production and the aunt doing the transportation? Yes, Your Honor. I think that first element in the aiding and abetting instruction is sufficiently clear. And that here, when you have a situation, and what the defense is really attacking is this intent element and that he intended to transport the child pornography back to the United States. And I certainly think it's logical for the jury to find that. Why else was the child pornography being produced? He wanted it to be a souvenir, a momentum that he could relive that abuse, and he certainly intended for it to come back. And we know that the aunt was the facilitator of the child pornography production by giving the defendant access to those children and being there for them. And as this particular video shows, the defendant is in the shower with the victim, and it's certainly reasonable for a jury to conclude that someone else was taking the video at that time because the defendant himself was appearing in it. So I think that it was clear enough for the jury to make that finding and that the evidence was sufficient for the jury to find that that production of child pornography was committed by someone and that the defendant aided and abetted in at least one element and intended for both elements to occur. So unless the court has any other questions, I submit on the briefs and request that this court affirm defendant's convictions and sentence in this matter. Thank you. Thank you, counsel. A rebuttal argument from Ms. Mierczak. We can't hear you. Are you muted? So sorry. I didn't want my wrestling to interfere, and so I muted myself. So I want to start directly with the point that was just raised in terms of what the jury instruction said. The jury instruction on aiding and abetting said production of child pornography had to be committed by someone and that the defendant had the intent to facilitate the production of child pornography. But neither of those instructions make clear either, one, that the intent has to run to both aspects of the crime or, as Your Honor is pointing out, that the same person had to commit that crime. So both of those jury instructions only refer to production, and I don't believe that it's clear enough that the intent had to run to both offenses and that both had to be committed by the same person. Now, in terms of the affidavit, the government counsel points to Daniel Huerta's statement. Daniel Huerta said he saw pictures. He thought some of them might have been from the Philippines, and then he separately described several images. He did not say that he saw an image of Ms. Ornalas doing anything to a child. He said that he saw groups of people, including adults, children, and Ornalas, and he believed that they were from the Philippines. So the statement from Daniel Huerta does not get them to the profile of a person who is not merely a consumer of child pornography, but an active or a hands-on sex offender. The government says the record is unclear about what Monica Abend knew. But I would point to two things. One, the government framed this case below as that it was not incorrect not to include the information known to the affiant about the 1997 information. To me, that's saying that there was something she knew. The other fact I would point out is that this court has said, in a case called De Leon, that it's not simply the knowledge of the affiant, but those who are working with the affiant. So, for example, we know Monica Abend was the one who actually interviewed the complaining witness. But she can't isolate... We don't isolate off the one person who has the information when the team is working together. The kind of imputed or collective knowledge doctrine applies there. The government raises this point about we didn't ask for... I'm so sorry. I have a motion censored light. Give me one second. These are things I'm not used to dealing with. The government says we only ask for Brady information, and that this should therefore be precluded under Guerrero. Guerrero has never been applied to a situation where the district court actually passed on the question involved. And the defense did not only ask for Brady. Indeed, it made a discovery request before trial. And it was clear that the district court was not simply thinking about Brady when it asked for this, or when it described its analysis. I see my time is ending. If there are other questions, I'm happy to address them. Thank you, counsel. The case just arguably submitted. We thank both counsel for the very helpful arguments this morning, especially under the unusual circumstances. Thank you.
judges: Collins, Lee, Presnell